**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

HOLLISTER INCORPORATED, an
Illinois corporation

    Plaintiff,

v.                                                    Case No. 3:13-cv-132-J-32PDB

ZASSI HOLDINGS, INC., a Florida
corporation and PETER VON
DYCK, an individual,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 7, 2013, Plaintiff Hollister Incorporated filed this case against Defendants Zassi Holdings, Inc. and Peter von Dyck, asserting a claim against Zassi for breach of the warranty of good and marketable title contained in an Asset Purchase Agreement ("APA") entered into by Hollister and Zassi (Count I), and a claim against Zassi and von Dyck for fraudulent inducement (Count II). (Doc. 1). Hollister alleged that during negotiations in connection with the APA, Defendants failed to disclose the material fact that Zassi had released future patent claims against ConvaTec, Inc. in a settlement agreement that Zassi had entered into with ConvaTec ("ConvaTec Agreement").

On August 6, 2013, the Court bifurcated the liability issues from damages for trial purposes. (Doc. 26). Liability was tried to a jury on February 4-7, 2014 before the Honorable Paul A. Magnuson. (Docs. 57, 60, 64, 72). On February 10, 2014, the jury rendered a verdict for Hollister on liability on both counts, finding, among other things, that Zassi and von Dyck had defrauded Hollister by failing to disclose in the sale negotiations that they had released certain patent claims against ConvaTec relating to bowel management systems ("BMS"). (Doc. 77). After Zassi's attorneys withdrew, and Zassi failed to retain new counsel, Hollister filed a Motion for Default Against Zassi (Doc. 147), and a clerk's default was entered against Zassi on September 4, 2015.[1] (Docs. 149, 150). Von Dyck has continued to defend the case.

The parties waived a jury trial on damages, and the Court conducted a damages bench trial on December 7-9, 2015. (Docs. 177-79). On March 30, 2016, the Court issued its Findings of Fact and Conclusions of Law. (Doc. 197). The Court found that Hollister proved that ConvaTec's Flexi-Seal fecal management system ("FMS") products literally infringed Hollister's U.S. Pat. No. 7,722,583 ("'583 patent") but that Hollister had "failed to prove by a preponderance of the evidence the amount of reasonable royalty damages" that Hollister would have

---

[1] Because Zassi has defaulted, based on the jury's liability findings and the Court's damages findings, judgment will be entered jointly and severally against Zassi and von Dyck.

recovered in its unsuccessful 2010 patent infringement lawsuit against ConvaTec but for Defendants' fraudulent concealment of the ConvaTec release. (Doc. 197 at 37). Accordingly, the Court entered a Final Judgment awarding Hollister no damages. (Doc. 198). The Court denied Hollister's Post-Trial Motion Pursuant to Fed. R. Civ. P. 52(b) and 59. (Doc. 205).

Hollister appealed, and on October 25, 2018, the Eleventh Circuit reversed this Court's decision and remanded the case for a new trial on damages consistent with its opinion. (Doc. 221 at 22); <u>Hollister Inc. v. Zassi Holdings, Inc.</u>, 752 F. App'x 888, 897 (11th Cir. 2018). The Eleventh Circuit noted two reversible errors. First, under Florida law, the Court should have calculated damages as of the time of Defendants' fraud in 2006, rather than the date of Hollister's unsuccessful infringement action against ConvaTec in 2010. <u>Id.</u> at 893-95. In addition, the Court erred in finding that Hollister failed to prove it was entitled to any damages. <u>Id.</u> at 895-97.

Following the Eleventh Circuit's mandate, the Court held a bench trial on December 17-18, 2019 to determine Hollister's damages. (Docs. 247, 248). The Court received post-trial submissions from the parties (Docs. 254, 255) and now makes its findings of fact and conclusions of law.

Florida law governs the damages award. Under Florida law, the burden of proving damages rests solely with the plaintiff. <u>Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Invs., LLC</u>, 238 So. 3d 908, 912 (Fla. Dist. Ct. App.

2018). At trial, Hollister relied on a benefit of the bargain theory of damages under Florida law. (Tr. II at 76:14-21). "Under a benefit of the bargain theory, damages are measured as 'the difference between the actual value of the property and its value had the alleged facts regarding it been true.'" Hollister, 752 F. App'x at 893 (quoting Kind v. Gittman, 889 So. 2d 87, 90 (Fla. Dist. Ct. App. 2004) (internal quotation marks omitted)). This measure of damages requires Hollister to prove the actual value of the property at the time of purchase. Id. The key timeframe for measuring damages is "the time of the fraudulent representation." Totale, Inc. v. Smith, 877 So. 2d 813, 815 (Fla. Dist. Ct. App. 2004). Applying the benefit of the bargain theory, Hollister's damages are the difference between what Hollister paid Zassi in 2006—$35 million—and what it would have paid had Zassi disclosed its release of infringement claims against ConvaTec. (Pl. Ex. 6).

As the Eleventh Circuit noted, there is not only one way to prove damages in this case, nor is there only one correct damages amount. Under Florida law, "a trial judge is vested with reasonable discretion in awarding damages." E.F.K. Collins Corp. v. S.M.M.G., Inc., 464 So. 2d 214, 215 (Fla. Dist. Ct. App. 1985). Generally, a damages award in a nonjury trial will be sustained on appeal if supported by a reasonable evidentiary basis. See Pearce & Pearce, Inc. v. Kroh Bros. Dev. Co., 474 So. 2d 369 (Fla. Dist. Ct. App. 1985).

4

In ordering a new damages trial, the Eleventh Circuit explained that "[t]here may be several ways for Hollister to establish the value of a reasonable royalty at the time of the fraud." Hollister, 752 F. App'x at 897.

> Hollister potentially could use the $5.9 million that ConvaTec paid Zassi for the release in their 2005 settlement agreement. After all, ConvaTec acquired the license in the settlement agreement only about a year before the fraudulent transaction. In the settlement agreement, though, Zassi also released ConvaTec from claims related to ConvaTec's use of Zassi's technology for other products. To use this agreement as a yardstick, Hollister probably would need to introduce some evidence showing what portion of the settlement payment represented the amount that ConvaTec paid to acquire the license for the bowel management system technology as opposed to the other technology. As an alternative, Hollister potentially could rely on a report from its investment banker written at the time of the transaction that valued the intellectual property Hollister acquired from Zassi at $8.7 million. To prove its damages in this way, Hollister would need additional evidence showing how much the value of the intellectual property portfolio declined due to ConvaTec's license.

Id. However, the Eleventh Circuit left open the possibility that Hollister might rely on another method, provided it was consistent with Florida law. Id.

Using the Eleventh Circuit opinion and the evidence adduced at trial, the Court has essentially been presented with three approaches to measure Hollister's damages.[2] First, there is the $5.9 million that ConvaTec paid Zassi

---

[2] Although the two metrics the Eleventh Circuit suggested as methods of calculating Hollister's damages originally arose under a patent damages reasonable royalty framework, the parties discussed these numbers at length during the trial,

5

in 2005 under the ConvaTec Agreement. Earlier, in 1999, ConvaTec and Zassi had entered into an agreement under which ConavTec funded Zassi's development of continent ostomy port ("COP") technology. (Pl. Ex. 87 at 10). Under that agreement, ConvaTec agreed to pay Zassi certain amounts upon reaching milestones in the development of the COP; ultimately, ConvaTec paid Zassi $3.3 million in funding associated with the development of the COP.[3] (Pl. Ex. 87 at 15:13-18). Pellegrino Pionati, ConvaTec's vice president of global marketing, research and development in 2005, testified that during the course of ConvaTec and Zassi's relationship, Zassi performed human clinical trials in South Korea without informing ConvaTec.[4] The clinical trials resulted in a significant adverse event that required the companies to report it to the FDA, resulting in additional—arguably unnecessary—work. (Pl. Ex. 87 at 12:8-15:12; Tr. II at 83:7-84:16).

During this period, Zassi informed ConvaTec that it was developing a BMS product, and the companies shared information regarding the BMS

---

and the Eleventh Circuit authorized using them as reference points in awarding damages.

The Court also notes that von Dyck offers no alternative damages calculation and argues that Hollister should not be awarded damages. (Doc. 254 ¶ 44).

[3] According to Hollister, the agreement regarding COP technology had no relationship with the Zassi BMS product. (Doc. 255 ¶ 14).

[4] At trial, the Court discussed the admission of Pionati's deposition with the parties. (Tr. II at 134-35). The Court deems Pionati's deposition admitted as Plaintiff's Exhibit 87.

6

market and its opportunities. They had finalized an agreement regarding development and distribution of Zassi's BMS product in 2002, but Zassi then told ConvaTec that it had decided to go a different way. Zassi was first to the market with its BMS product in 2003, and a year and a half later, ConvaTec introduced its product, the Flexi-Seal FMS. Zassi felt that ConvaTec had misused Zassi's trade secrets in creating the Flexi-Seal. (Tr. II at 95:12-22).

Following the deterioration of their relationship, ConvaTec and Zassi underwent mediation to resolve their disputes, which resulted in the ConvaTec Agreement. ConvaTec paid Zassi $5.9 million in the ConvaTec Agreement, which included a release:

> ZASSI hereby fully and forever releases, acquits, and discharges CONVATEC, . . . from any and all past, present or future claims (including, without limitation, claims for patent infringement or misappropriation and/or misuse of confidential information), to the extent such claims relate in any manner or degree to CONVATEC's present or past commercially available FMS design, currently marketed by CONVATEC as the Flexi-Seal® FMS product…

(Pl. Ex. 6 ¶ 10). ConvaTec also received a non-exclusive license for the COP technology, which Pionati stated ConvaTec never pursued. (Pl. Ex. 87 at 42:7-20).

According to Pionati, while none of the $5.9 million related to the COP technology, as part of the settlement, ConvaTec relinquished its $3.3 million claim against Zassi for its conduct in connection with the COP technology. (Pl.

7

Ex. 87 at 40:15-41:23, 111:16-115:15). Anthony Tinari, general counsel for ConvaTec in 2005, corroborates Pionati's assertions that virtually all of the $5.9 million payment to Zassi, and the decision to forego the $3.3 million COP claim, was paid to secure the Zassi release of all future claims related to the Flexi-Seal product. (Tr. II at 104:19-105:5). As such, Hollister argues that the Court should consider that ConvaTec's settlement with Zassi involved a value of $5.9 million plus the forbearance of the $3.3 million COP breach of contract claim for a total value to Zassi of $9.2 million. (Pl. Ex. 87 at 112:8-115:15; Tr. II at 54:1-15, 104:19-105:5).

By contrast, von Dyck argues that the Court should reject the amount associated with ConvaTec's settlement with Zassi as an unreliable point of reference. (Doc. 254 ¶¶ 40, 47). Von Dyck testified that Zassi did not perceive it was giving up any intellectual property protection in the BMS market by releasing ConvaTec's Flexi-Seal product. (Tr. II at 175:24-176:4). However, he also testified that not all of the $5.9 million paid to Zassi was for the COP. (Tr. II at 193:19-194:19). Von Dyck argues that the value of the ConvaTec settlement is irrelevant to the damages analysis because no amount of the settlement is attributable to the '583 patent application, which had not been filed as of the date of the ConvaTec Agreement. (Doc. 254 ¶ 40; Def. Ex. 27). Rather, according to von Dyck, the ConvaTec Agreement simply reflected ConvaTec's desire to market its Flexi-Seal product faster than it would have

8

been able to if it had to design around Zassi's BMS intellectual property; with the ConvaTec Agreement in place, ConvaTec obtained freedom to operate in the BMS and COP fields.

The second damages approach is consulting firm Houlihan Lokey's $8.7 million valuation of the intellectual property Hollister acquired from Zassi under the APA. (Pl. Ex. 73). Houlihan Lokey performed the valuation in 2007 for Hollister's financial reporting and tax purposes. (Tr. I at 31:21-32:4). Hollister's expert damages witness, David N. Paris, testified that Houlihan Lokey used a royalty avoidance methodology to reach its valuation, which determines what royalty Hollister would avoid by acquiring, rather than licensing, the technology. (Tr. I at 133:12-135:17). Because Houlihan Lokey generated this valuation for financial reporting and tax purposes, Hollister contends that the true value of the intellectual property is higher than $8.7 million. To that end, Paris testified that the valuation does not contemplate that the intellectual property at issue is infringed by a competitor. (Tr. II at 63:5-12).

By contrast, von Dyck argues that the Court should reject the $8.7 million valuation based on a "lack of evidence establishing what portion of the value of the overall patent portfolio as of September 2006 if any would be attributable to a non-exclusive license of the '583 patent to ConvaTec limited to allowing ConvaTec to continue producing its 2006 and prior FMS product versions as

9

opposed to fully exploiting the full rights of the '583 patent." (Doc. 254 ¶ 48). In other words, the Houlihan Lokey valuation arguably included intellectual property that ConvaTec would not necessarily have had to license from Zassi to make its FMS products, so the relevant valuation here should be lower than $8.7 million. (Tr. II at 64:17-65:9).

In the third approach, Hollister's expert presented an entirely different way to determine Hollister's damages. Paris analyzed what Hollister would have paid for the Zassi BMS assets had it known about the release in the ConvaTec Agreement. To do so, he used Hollister's analysis of the asset purchase at various points in time during negotiations with Zassi to calculate a revised projection of its sales revenues had Hollister known about the release. (Tr. I at 135:21-137:2). According to Paris, this approach is particularly appropriate here because there was no real world comparable with which he could work. (Tr. I at 146:19-147:6). Thus, Paris employed the same procedure Hollister used in the real world—where it did not know about the release—to obtain a damages amount in the "but-for world"—where Hollister knew about the release.

Specifically, Paris estimated that had Hollister known about the release, it would have revised its cumulative seven-year post-asset purchase revenues from approximately $176.5 million (projected sales) to $50.1 million (actual sales), and based on that figure, Paris calculated that Hollister would have paid

10

a revised purchase price at closing of approximately $9.3 million. (Pl. Ex. 86, Demonstratives 1, 4). Comparing the $9.3 million and the actual purchase price of $35 million, Paris arrived at Hollister's damages: $25.7 million. (Tr. I at 138:4-14).

The Court has considered all three approaches to calculating damages, as each has some merit and provides the Court with information about a potential damages award. Regarding the first approach—the amount ConvaTec paid Zassi under the ConvaTec Agreement—the Court has evaluated the parties' arguments and is persuaded that the beginning point to value the settlement is $5.9 million plus the forbearance of the $3.3 million COP breach of contract claim for a total value of $9.2 million. Both Pionati and Tinari are former ConvaTec employees who were involved with the execution of the ConvaTec Agreement. They are disinterested third parties, and the Court finds them to be credible witnesses. Von Dyck, on the other hand, continues to contest liability (which has already been established) and argues for no damages; his testimony is less helpful.

Next, the Court has assessed the utility of the $8.7 million Houlihan Lokey valuation. Like the value of the ConvaTec Agreement, this number is temporally helpful in that it values the assets around the time of the breach. However, Houlihan Lokey may have undervalued the assets to some degree because it computed the valuation for Hollister's financial reporting and tax

11

purposes. It also did not consider the possibility that ConvaTec's Flexi-Seal might infringe the Zassi intellectual property. However, the parties did not suggest by how much the Court should adjust this valuation up or down, leaving the Court with the $8.7 million figure to weigh.

Finally, the Court has considered Paris's $25.7 million damages amount, based on Hollister's revised sales projections had it known about the release. While the Court finds this approach helpful to some extent, Paris's opinion overvalues the damage Hollister suffered for several reasons. First, the testimony of Hollister's witnesses Seamus Kavanagh and Michael Gresavage does not support the proposition that Hollister placed significant financial value on a patent infringement action against ConvaTec at the time it was negotiating to acquire Zassi's assets. (Tr. I at 70:21-71:18, 117:10-118:5). When asked by counsel and the Court, neither witness could point to a document or recall statements to Hollister's Board of Directors or the Board of Trustees that would demonstrate that Hollister factored the value of excluding ConvaTec from the BMS market into its valuation of the acquisition of the Zassi intellectual property. The Court is aware that Kavanagh testified that Hollister was concerned during negotiations that Zassi's patent application was not written very strongly, and "if [Hollister was] to invest in this technology, [Hollister wanted] to make sure that [it] could protect it." (Tr. I at 18:4-8). Such testimony suggests that Hollister was considering possible infringement claims against

competitors during negotiations with Zassi, and ConvaTec was the only other player in the market at the time. However, overall, the testimony of the Hollister witnesses does not support Paris's numbers.

Another factor that decreases the utility of Paris's damages proposal is that in 2006, Hollister could not have filed an infringement action against ConvaTec using the intellectual property it acquired from Zassi. Hollister only acquired a patent application in 2006; while that application would eventually issue as the '583 patent in 2010—which could be used in an infringement action against ConvaTec but for the release—at the time of the APA, Hollister did not acquire the immediate right to exclude ConvaTec's Flexi-Seal from the BMS market. Kavanagh testified that the claims language in the patent application was not broad enough, and Hollister would have to expand the scope of the patent application so that the ConvaTec product would read on the technology. (Tr. I at 42:23-44:1). Of course, in 2006, there were no guarantees that the expanded patent application would be approved so that Hollister might exclude ConvaTec from the BMS market. Further, at the time of the Zassi transaction, Hollister knew ConvaTec was already selling the Flexi-Seal, and it took Hollister another four years until it could sue ConvaTec for patent infringement in 2010. Under these circumstances, the ability to exclude ConvaTec from the BMS market in 2006—but for the release—was not as important to Hollister's projected sales as Paris suggests.

Finally, Paris's calculation relies on Hollister's baseline plan of sales projections, developed in August 2006 before the acquisition and presented to the Board of Directors in an Asset Acquisition Proposal for Zassi Medical Evolutions Bowel Management System. (Pl. Ex. 65). Hollister's baseline plan envisioned achieving cumulative sales of approximately $176.5 million during its first seven years of BMS operations. (Doc. 255 ¶ 73; Tr. I at 28:10-17). This figure originates from Hollister's internal projections, and Hollister has shown no objective or external check on this number to verify its accuracy.[5] Moreover, Paris did not address other factors which might have depressed Hollister's actual sales revenues from its original projections. Accordingly, the Court concludes that Paris's damages estimate overstates the amount of damages to which Hollister is entitled.

Arriving at a final damages number has proved difficult. It is impossible to precisely calculate how much Hollister's inability to enforce its later-acquired patent rights against ConvaTec impacted the benefit of its bargain with Zassi and von Dyck in 2006. But, as the Eleventh Circuit has reminded, it is the Court's responsibility to determine damages even if the proof "wasn't very

---

[5] Not discussed at trial, Hollister cites in its post-trial submission Plaintiff's Exhibit 33, which appears to be Zassi's sales projections provided to Hollister in June 2006. (Doc. 255 ¶ 35). Plaintiff's Exhibit 33 is not on Plaintiff's Amended Exhibit List (Doc. 242), and the exhibit is not in the record (Doc. 249). Thus, it will not be considered.

exact." See Hollister, 752 F. App'x at 895. The Court will base its damages award on this teaching from the Eleventh Circuit:

> Because the fraud related only to the existence of ConvaTec's license, we accept that evidence about the value of ConvaTec's license in 2006 would represent Hollister's benefit of the bargain damages, as it would establish the difference between the actual value of the property that Hollister received (which was subject to ConvaTec's license) and its value had the alleged facts about the property it been true (in which case ConvaTec would have had no license). In establishing the value of the license at the time of the transaction in 2006, Hollister could indeed borrow patent law's reasonable royalty model.

Id. at 897. Considering the Eleventh Circuit's instruction in conjunction with all of the evidence, the Court, as fact-finder, determines that the proper damages award is the value of the ConvaTec Agreement: $9.2 million.[6] While the amount of Hollister's damages is not easily ascertained, the value of the ConvaTec Agreement comes closest both temporally and in terms of the relevant intellectual property assets for the Court to conclude that it is the best measure of damages available in this complex case.

Accordingly, it is hereby

**ORDERED:**

1. The Court determines that Hollister's damages are $9.2 million.

---

[6] Hollister notes in its post-trial submission that "at best, the value of the ConvaTec settlement is a floor to any possible award of damages to Hollister." (Doc. 255 ¶ 70).

2. The Clerk shall enter judgment jointly and severally in favor of Plaintiff Hollister Incorporated and against Defendants Zassi Holdings, Inc. and Peter von Dyck in the amount of $9.2 million.

3. The Clerk shall thereafter close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 16th day of January, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

sej
Copies:

Counsel of record